**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **DEBORAH K. RUBY,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| v. § | Civil Action No. 3:08-CV-1012-B (BF) |
| § | |
| § | |
| **MICHAEL J. ASTRUE** § | |
| **COMMISSIONER OF THE SOCIAL** § | |
| **SECURITY ADMINISTRATION,** § | |
| § | |
| **Defendant.** § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the District Court's Order of Reference of June 16, 2008, the District Court referred Deborah K. Ruby's ("Plaintiff") social security appeal, filed June 16, 2008, to the United States Magistrate Judge for hearing, if necessary, and recommendation. This is an appeal from the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Commissioner filed an answer on November 13, 2008. The Court has considered Plaintiff's brief, filed March 10, 2009, the Commissioner's response, filed April 8, 2009, and Plaintiff's reply, filed May 21, 2009. After a thorough review of the record, the Court recommends that the final decision of the Commissioner be reversed and remanded for further proceedings consistent with this recommendation.

**Procedural History**

Plaintiff protectively filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act on July 13, 2005. The application was denied initially and upon reconsideration. (Tr. 65; 30; 29.) Plaintiff timely filed a request for hearing. (Tr. 36.) Administrative Law Judge ("ALJ") Walter Orr conducted a *de novo* administrative hearing on June 1, 2007, in Dallas, Texas. (Tr. 32; 375-405.) Plaintiff appeared at the hearing with her attorney, Ms. Sally Robbins ("Ms. Robbins"), and testified. (Tr. 38; 377-402.) The ALJ called Ms. Z. Suzette Skinner, M.S., to testify as a Vocational Expert ("VE"). (Tr. 48; 402-405.)

On August 23, 2007, the ALJ issued his Notice of Decision finding Plaintiff "not disabled." (Tr. 18-27.) Plaintiff requested a review of the ALJ's decision by the Appeals Council on September 1, 2007, and submitted a memorandum and additional evidence in support of review on February 3, 2008. (Tr. 17; 8-12; 336-374.) Nevertheless, the Appeals Council denied the Plaintiff's request for review by Notice dated March 11, 2008. (Tr. 4-7.) By letter to the Appeals Council dated May 15, 2008, Plaintiff requested an extension of time within which to commence a civil action, and timely commenced this action within the requested time. (Doc.1, Ex.)

**Factual History**

Plaintiff's alleged onset date of disability is July 1, 2002, and her date last insured ("DLI") was December 31, 2004. (Tr. 65.) Plaintiff was born on December 26, 1952. (*Id.*) She was 49 years old on her alleged onset date and was considered a "younger individual" until her 50th birthday in December 2002, after which she was considered an individual "closely approaching advanced age." (*Id.*) *See* 20 C.F.R. § 404.1563(c) & (d).

2

Plaintiff graduated from high school and served in the U.S. Army from 1973 to 1976. (Tr. 75; 380-381.) During her military service, she completed certification as a licensed practical nurse ("LPN"). (Tr. 381.) Later, in 1984, she earned an associate's degree in early childhood education, but she did not work in that field in the fifteen years preceding her DLI. (Tr. 75; 380.)

Plaintiff last worked for three years as a part-time office nurse. She administered shots for four hours a day, four days a week. (Tr. 382.) Previously, she worked for about three years as a full-time office nurse, a skilled occupation demanding light physical exertion. (*Id.*; Tr. 402.) Between 1990 and 1992, Plaintiff provided home nursing care for a muscular dystrophy patient, a semi-skilled job, demanding medium physical exertion. (Tr. 381; 402.)

### **Plaintiff's Medical Evidence**

Plaintiff first injured her left knee in 1984, necessitating arthroscopic surgery to "rearrange her kneecap" and repair a torn meniscus. (Tr. 108.) On examination in November 2000, orthopedic surgeon Todd Johnson, M.D. ("Dr. Johnson"), found valgus, or "knock-kneed," alignment, exquisite medial joint line tenderness, and an antalgic gait. (*Id.*) X-rays of the left knee showed "collapse of the medial compartment with near bone-on-bone," as well as subchondral sclerosis and marginal osteophytes consistent with post-meniscectomy arthritis. (*Id.*)

By June 2003, Plaintiff was also having problems with her right knee. Dr. Johnson ordered an MRI scan of her right knee, which showed meniscal degeneration but no frank tear. (Tr. 118.) However, Dr. Johnson felt the MRI images were poor and ordered a second MRI in October 2003, which showed a "rather large posterior horn medial meniscus tear and chondromalacia" as well as degenerative joint disease. (Tr. 105; 112; 115; 117.) Describing her right knee as causing "debilitating pain" with locking, catching, and giving way, Dr. Johnson abandoned further

conservative treatment and performed surgery on her right knee on November 11, 2003. (Tr. 112-114.) Specifically, the orthopedist performed a partial medial meniscectomy; chondroplasty at two sites of the medial femoral condyle, the medial tibial plateau, and the patella and trochlea; and removal of loose bodies. (Tr. 112.) He also implanted a sciatic nerve block/instillation pain pump. (*Id.*) Two months after surgery, Plaintiff's range of motion in her right knee had improved, but she continued to have pain in both knees. (Tr. 103.) Dr. Johnson administered a series of three bilateral knee injections for pain relief in January 2004. (Tr. 102-103.)

Plaintiff also has a long history of back problems pre-dating a lumbar laminectomy at level L4-5 with decompression of the nerve roots in August 1997. (Tr. 330-331; 344-345.) In March 2004, Plaintiff's low back pain recurred, radiating down her thigh and into her calf. (Tr. 102.) She reported to Dr. Johnson that her back and leg pain was aggravated by sitting, lying flat, and walking. (*Id.*)

Dr. Johnson's examination revealed pain with forward bending, a positive straight-leg-raising test, and no obtainable deep tendon reflexes. (*Id.*) He prescribed the steroidal Medrol Dosepak, the non-steroidal anti-inflammatory Lodine, and the narcotic pain reliever Darvocet N100. (*Id.*) Ultimately, he ordered a lumbar MRI scan in September 2005 which showed severe spinal stenosis, severe facet arthropathy, and bilateral foraminal stenosis at L4-5, the site of Plaintiff's prior surgery. (Tr. 297-298.)

According to Plaintiff's treating orthopedist, Dr. Johnson, Plaintiff's obesity exacerbated her arthritis of the low back and knees. (Tr. 295.) Although Dr. Johnson's opinion is contained in a July 2006 report, there is no indication that Dr. Johnson's report was limited to Plaintiff's condition after her DLI. Plaintiff is 5'2" tall, and she was within the morbid obesity range during the insured

4

period, both at her highest recorded weight of 266 and at her lowest recorded weight of 253.[1] (Tr. 369).

Plaintiff was first diagnosed with trigeminal neuralgia ("TN") in approximately 1980. (Tr. 320; 374.) Plaintiff experienced electric and burning pain in her face. The pain, at its worst, was a 10 on a scale of 1-to-10. Plaintiff underwent an MRI of the brain in September 2002 and again in December 2004. The doctors determined from those MRIs that Plaintiff's pontomesencephalic vein was abutting her trigeminal nerve. (Tr. 266-267.) In August 2001, the month following her alleged disability onset date, she saw Steven Bender, D.D.S. ("Dr. Bender") and reported that her TN pain had grown more frequent over time so that she was experiencing daily attacks lasting from two minutes to more than 20 minutes at a time. (*Id.*) She was taking daily doses of Neurontin, 2400 mg., an anti-convulsant prescribed for nerve pain, and Vioxx, 100 mg., a non-steroidal anti-inflammatory drug. Dr. Bender added another anti-convulsant, Trileptal, 1200 mg. daily, to her medication regimen. (Tr. 320; 374.)

When Plaintiff consulted neurologist J.N. Wolfman, M.D. ("Dr. Wolfman"), in October 2001, Dr. Wolfman described her as "deeply troubled" by her TN. (Tr. 322.) She told Dr. Wolfman that her TN pain had become more "electric-like" and that the Neurontin was affecting her short-term memory and causing ataxia, i.e., incoordination. *Id.* In fact, Dr. Wolfman stated that the "limiting step" preventing Plaintiff from working was "her ability to cope with trigeminal neuralgia

---

[1] Plaintiff weighed 258 pounds in May 1999. (Tr. 260, 362.) Dr. Wolfman stated in October 2001 that Plaintiff had lost 10 to 15 pounds. (Tr. 323.) By March 2003, she weighed 266 pounds. (Tr. 373.) In January 2004, Plaintiff's weight was back down to 253, but in March 2005, three months after her DLI, she weighed 264 again. (Tr. 369, 260.)

and side effects of the medication." (Tr. 323.) His treatment plan was to increase Plaintiff's daily dosage of Trileptal to 1800 mg., and to slowly wean her off Neurontin. (*Id.*)

In August 2002, Dr. Wolfman found Plaintiff's TN pain under control but noted she suffered sedation and fatigue as the side effects of Trileptal. (Tr. 365.) Plaintiff was still taking 1200 mg. of Neurontin daily. (*Id.*) By July 2003, her dosage of Neurontin had been tapered to 900 mg. per day, but she continued on Trileptal, 1800 mg., for pain control. (Tr. 366.)

In January 2004, Plaintiff was "not doing well." (Tr. 369.) Dr. Wolfman had to restore her dosage of Neurontin to 2400 mg. daily to better control her TN. (*Id*). When Dr. Wolfman examined Plaintiff once more before the expiration of her insured status in December 2004, he found that her TN had "acted up more" since her last appointment, so he ordered a new MRI of her brain. (Tr. 268.)

In May 2005, after her DLI, Plaintiff consulted Robert Replogle, M.D. ("Dr. Replogle"), an assistant professor of neurosurgery at UT Southwestern Medical Center. (Tr. 250-251.) She explained to Dr. Replogle that she was experiencing episodes of left-sided facial pain "lancinating in nature with electric-like symptoms triggered by eating, touching the left side of her nose, talking, and turning her head" lasting up to 45 minutes. (Tr. 250.) The neurosurgery professor observed that Plaintiff was "in some distress" from her facial pain during his examination and found her signs and symptoms to be "classic" of TN. (*Id*). Plaintiff underwent brain surgery in June 2005. (*Id*. 250-253.)

### **The ALJ's Decision**

The ALJ ruled at Step 1 of the sequential evaluation of disability that Plaintiff did not engage in substantial gainful work activity during the period under review. (Tr. 23.) At Steps 2 and 3 of

6

the sequential evaluation, the ALJ found that, during her insured period, Plaintiff suffered from "back and knee pain, arthritis, and short-term memory loss" which were "severe" impairments, but which did not meet or medically equal the criteria of any Listing of Impairment in Appendix 1. (Tr. 23; 25.) Before proceeding to Step 4 of the sequential evaluation, the ALJ held that Plaintiff retained the residual functional capacity ("RFC") to perform unskilled light work limited by occasional balancing, stooping, kneeling, crouching, and crawling; occasional climbing of ramps/stairs; and no climbing of ladders, ropes, or scaffolds. (Tr. 25.) The ALJ ultimately ruled at Step 4 that Plaintiff could not perform her past relevant work as an LPN. (Tr. 25-26.) At Step 5, the ALJ relied on VE testimony to hold that Plaintiff could have performed other work existing in the national economy and, therefore, was "not disabled" before her DLI. (Tr. 26-27.)

## The Appeals Council

Plaintiff submitted a memorandum and additional evidence in support of review to the Appeals Council on February 3, 2008. (Tr. 17; 8-12; 336-374.) The Appeals Council denied her request for review by Notice dated March 11, 2008. (Tr. 4-7.)

## Legal Standard of Review

A claimant must prove that she is disabled for purposes of the Social Security Act to be entitled to social security benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at step five. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989)). At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

## Issue

The issue is whether the ALJ committed reversible error by failing to consider whether Plaintiff's TN and morbid obesity were severe impairments during the insured period and by failing to apply the severity standard set out in *Stone v.Heckler* at Step 2 of the sequential evaluation of disability. 752 F.2d 1099 (5th Cir. 1985).

## Analysis

### Whether the ALJ Failed to Properly Identify Plaintiff's Severe Impairments During the Insured Period

The ALJ found that Plaintiff met the insured status requirements of the Act on December 31, 2004, and had not engaged in substantial gainful activity since her onset date of July 1, 2002. (Tr. 3.) Furthermore, the ALJ determined that Plaintiff had the following severe impairments during her insured period: back and knee pain, arthritis, and short term memory loss. (*Id*.) The ALJ stated that Plaintiff "did not allege TN in her application of July 13, 2005, as she had already had surgery which restored functionality." (*Id*.) The ALJ's opinion does not mention Plaintiff's morbid obesity and its effect upon Plaintiff's back and knee pain and arthritis.

The Court first considers Plaintiff's argument that the Commissioner erred by failing to consider the effects of TN and morbid obesity for the period under consideration. Plaintiff

contends that the evidence in the record reflects the debilitating effects of the treatment and conditions but that the ALJ made no finding about these impairments. Plaintiff argues that the inquisitorial nature of Social Security proceedings imposes a duty upon the ALJ to "investigate the facts and develop the arguments both for and against granting benefits." (Pl.'s Reply Br. at 2.) She maintains that the implication of this duty requires the ALJ to consider every impairment documented by the evidence in the record. Plaintiff, therefore, argues that the ALJ cannot neglect the TN or obesity effects in his findings simply because Plaintiff did not specifically allege them in her application.

"It is the duty of the ALJ to fully and fairly develop the facts relative to a claim for benefits. When [he] fails in that duty, [he] does not have before [him] sufficient facts on which to make an informed decision." *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (per curiam). To develop the facts fully, the ALJ "review[s] all of the evidence relevant to [an applicant's] claim." 20 C.F.R. § 404.1527(c). In *Newsome v. Barnhart*. No. 3:03-CV-3030-D, 2004 WL 3312833, at *5 (N.D.Tex. Oct. 8, 2004) (Fitzwater, J.), the court found that the plaintiff "did not put the ALJ on notice" to develop the record with respect to one of the claimant's impairments. *Id*. Newsome neither alleged the disability on her application nor brought it up during her disability hearing.[2] *Id*. The facts in this case are distinguishable from those in *Newsome*. Plaintiff did not allege pain from TN because the pain was almost gone due to surgery, but did allege she still had short term memory loss. (Tr. 90.) Plaintiff also alleged that she had obesity. During her hearing, she presented numerous examples of the effects of her TN, both during opening statements and in response to questioning. (Tr. 71;

---

[2]The court in *Newsome* relied upon an Eighth Circuit Court of Appeals decision reviewing whether the plaintiff provided the ALJ with notice by application or statement at the hearing. *Kitts v. Apfel*, 204 F.3d 785, 786 (8th Cir. 2000) (per curiam).

379; 383-85; 397-400.) Plaintiff also brought her obesity to the ALJ's attention. (Tr. 379-80.) And, finally, the medical records reflect the severity of Plaintiff's TN and the effect of obesity on her arthritis of the knees and low back. (Tr. 323; 295.) The Court concludes that the ALJ received sufficient notice to review and, if necessary, develop the record further with respect to Plaintiff's TN and the effects of Plaintiff's obesity on her back and knee pain and arthritis.

The ALJ's decision lacks a determination of whether Plaintiff's TN was a severe impairment during the period of alleged disability and whether, singly, or in combination with her other impairments, it rendered her disabled before her DLI. The record also reflects no direct evaluation of the "additional and cumulative effects" of obesity upon Plaintiff's other impairments and their resultant limitations. 20 C.F.R. pt. 404, subpt. P, app. 1, at § 1.00(Q). Consequently, the ALJ erred by failing to consider Plaintiff's TN and the effects of her obesity on her arthritis during the insured period.

## Application of Incorrect Legal Standard

Plaintiff contends that the ALJ failed to cite and to apply the severity standard set forth in *Stone* to Plaintiff's TN and to her obesity. (Pl.'s Br. at 6.) And, Plaintiff further contends that both TN and obesity were severe impairments during the insured period. (*Id.*) *Stone* held that "[a]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101 (adopting the standard articulated in *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). Plaintiff submits, and the Commissioner agrees, that the ALJ applied the following regulatory definition when determining which of Plaintiff's impairments were "severe:"

11

> An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.

20 C.F.R. § 404.1521 and its corollary SSRs. (Pl.'s Br. at 12.) The ALJ also applied the following definition at Step 2:

> An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.

(Def.'s Br. at 3, citing Tr. 22.) The Commissioner argues that the second definition is "consistent with the *Stone* standard of severity." In *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986), while acknowledging that *Stone* does not require wholesale remand of all severity cases, the Fifth Circuit reaffirmed that the ALJ may not rely solely on the language of the present regulation and must set forth the correct standard by reference to Fifth Circuit opinions or by an express statement that the Fifth Circuit's construction of the regulation has been applied. *Id.* In this case, the ALJ did not meet this requirement. The "minimal effect on an individual's ability to work" definition that the ALJ used in this case is not the standard set forth in *Stone*. In the Fifth Circuit, the appropriate legal standard for determining whether a claimant's impairment is severe is *de minimus*:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

*Stone,* 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984) and citing *Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir. 1984); *Martin v. Heckler*, 748 F.2d 1027, 1032 (5th Cir. 1984)). *See Loza* v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000). The United States District Court for the Northern District of Texas is consistent in its refusal to find that the standard applied in this

case is the standard set forth in *Stone*. *See Sanders v. Astrue*, No. 3:07-CV-1827-G (BH), 2008 WL 4211146 at *7 (N.D. Tex. Sept. 12, 2008); *Scroggins v. Astrue*, No. 3:08-CV-1444-L (BH), 2009 WL 192875, at *5 (N.D. Tex. Jan. 27, 2009). Unlike the standard that the ALJ applied, *Stone* provides no allowance for minimal interference on a claimant's ability to work. Although this court has recognized that the difference between the two statements may appear to be slight, the ALJ's construction is not an express statement of the *Stone* standard. This difference, coupled with the ALJ's failure to cite *Stone* or a similar opinion, or to expressly mention the Fifth Circuit's interpretation of the regulation, constitutes the ALJ's application of an incorrect legal standard and requires reversal and remand for legal, rather than procedural, error. *Sanders*, 2008 WL 4211146, at *7; *Scroggins*, 2009 WL 192875, at *5. *See Rangel v. Astrue*, 605 F. Supp. 840, 851 (W.D. Tex. 2009).

Neither the ALJ nor the Appeals Council can find a claimant not disabled at step 2 without first considering the claimant's actual ability to perform substantial gainful activity. *Stone*, 752 F.2d at 1104. The ALJ never analyzed Plaintiff's ability to perform substantial gainful activity during the relevant time, i.e., July 1, 2002 to December 31, 2004. According to the ALJ, questions regarding substantial gainful activity were limited to Plaintiff's abilities and disabilities at the time of her application of July 13, 2005, when Plaintiff had "already had surgery which restored functionality." (Tr. 23.) Although the ALJ did not consider Plaintiff's TN to be a severe impairment, he found that her short term memory problems from the TN and the medications she took for TN limited her to unskilled work. (*Id.* at 25.)

The record is replete with competent medical evidence of the effects of Plaintiff's obesity upon her arthritis and of her sufferings with the pain and limitations of TN and its medications

13

during the insured period. Plaintiff's treating physician for TN, Dr. Wolfman, stated that the "limiting step" preventing Plaintiff from working was "her ability to cope with trigeminal neuralgia and side effects of the medication." (Tr. 323.) According to Plaintiff's treating orthopedist, Dr. Johnson, Plaintiff's obesity exacerbated her arthritis of the low back and knees. (Tr. 295.) Nevertheless, the ALJ failed to evaluate Plaintiff's obesity or TN at Step 2 under the Fifth Circuit's legal standard of severity as set out in *Stone* and its progeny. In sum, the ALJ failed to properly apply the *Stone* standard to his analysis. The Fifth Circuit has mandated that "[u]nless the correct standard is used, the claim must be remanded to the [Commissioner] for reconsideration." *Stone,* 752 F.2d at 1106. Thus, the case must be reversed and remanded for further consideration.

## RECOMMENDATION

The Court recommends that the decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**SO RECOMMENDED**, October 13, 2009.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

14

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc*).*